| | |
|---|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK<br>------------------------------------------------------------ X<br>EVOLUTION MARKETS, INC.,<br><br>       Plaintiff,<br>   -v-<br><br>ROESLEIN ALTERNATIVE ENERGY, LLC, et al.<br>       Defendants,<br>     and<br><br>ROESLEIN ALTERNATIVE ENERGY, LLC, et al.<br>       Plaintiffs,<br>   -v-<br><br>EVOLUTION MARKETS, INC.,<br><br>       Defendant.<br>------------------------------------------------------------ X | USDC SDNY<br>DOCUMENT<br>ELECTRONICALLY FILED<br>DOC #: _____<br>DATE FILED: <u>August 16, 2018</u><br><br><br>17-cv-3474 (KBF)<br><br>OPINION & ORDER |

KATHERINE B. FORREST, District Judge:

  This is an action alleging breach of a contractual commitment to pay a brokerage commission. Plaintiff filed its original complaint in May 2017 (ECF No. 1), and has since amended its pleading twice. The Second Amended Complaint ("SAC") is now the operative pleading (ECF No. 35), and asserts a claim for breach of contract or for account stated. Defendants responded with a counterclaim for a breach of fiduciary duty. (ECF No. 39.) After full discovery, the parties have now cross-moved for summary judgment. (ECF Nos. 136, 140.) Plaintiff has moved for summary judgment on its affirmative claims as well as to dismiss the counterclaim; defendants have moved against the affirmative claims and for judgment in their

favor on the counterclaim.  For the reasons set forth below, all claims fail.  Both motions are therefore GRANTED IN PART and DENIED IN PART.  The result is that all claims are dismissed against both parties.

I. FACTS PERTINENT TO RESOLUTION OF THE MOTIONS[1]

On March 5, 2015, plaintiff Evolution Markets, Inc. ("Evolution") and defendant Roeslein Alternative Energy, LLC ("Roeslein") entered into a Brokerage Services Agreement ("BSA").  (Decl. of Virginia L. Woodfork ("Woodfork Decl.") Ex. 2, BSA, ECF No. 146 (under seal).)  Pursuant to the BSA, Evolution would provide Roeslein exclusive introductory brokerage services with respect to the sale of biomethane gas (referred to in the BSA as "Green Gas," developed from swine waste), which Roeslein was developing and seeking regulatory approval to market.  Eleven months later, on February 13, 2015, Roeslein[2] and a potential buyer of such gas, Duke Energy Carolinas, LLC ("Duke"), entered into a Base Contract for Sale and Purchase of Natural Gas (the "Base Contract").  (Woodfork Decl. Ex. 23, Base Contract, ECF No. 146 (under seal).)  There is no dispute that plaintiff Evolution introduced Roeslein and Duke.  On March 16, 2015, a month after Roeslein and Duke entered into the Base Contract, they executed a Transaction Confirmation.  (Woodfork Decl. Ex. 23, Transaction Confirmation, ECF No. 146 (under seal).)  Together, these documents form the backdrop for the dispute regarding Evolution's claim to an unpaid commission fee, and Roeslein's claim that none is owed.

---

[1] The following facts are undisputed unless otherwise noted.
[2] The contracting entity was an affiliated Roeslein entity, Roeslein Alternative Energy of Missouri, LLC.

2

This action stems from the fact that Roeslein never sold and delivered Green Gas to Duke. Instead, Roeslein's plans for the conversion of swine waste into saleable natural gas were unsuccessful. As a result, Roeslein and Duke terminated their agreement. (Woodfork Decl. Ex 29, ECF No. 146 (under seal).) The issue here, however, is that Evolution reads its contractual arrangement with Roeslein as providing for payment of a substantial commission, despite the termination of the Roeslein-Duke agreement. A careful review of the contracts demonstrate why this is incorrect.

This is a dispute regarding whether a commission payment is owed to Evolution. To answer this question, several pertinent terms of the BSA must be read together with certain terms of the contractual arrangement between Roeslein and Duke. First, the BSA provides that Roeslein shall "from time to time instruct Evolution to arrange, source and/or structure the sale of Green Gas ("Transact" or "Transaction") on such terms and conditions as [Roeslein] may determine . . . ." (Woodfork Decl. Ex. 2, BSA ¶ 2.) A Transaction is then confirmed in writing with specified type/product, date, price, quantity, term, delivery, settlement, commission and counterparty. (Id. ¶ 4.) Once Roeslein has received a Confirmation, along with any project financing funds, its obligation to pay a Confirmation Fee of $50,000 is triggered. (Id. ¶ 6.) A "Confirmation Fee" is then payable to Evolution. Here, it is undisputed that following the execution of the Base Contract between Roeslein and Duke, Roeslein paid Evolution this Confirmation Fee.

The heart of plaintiff's claim here concerns the BSA's provisions regarding

3

payment of the Commission. The BSA provides as follows:

> In addition [to the Confirmation Fee], [Roeslein] shall pay Evolution a fee (the "Commission") equal to 1% of the Transaction Value for the sale of Green Gas. The Commission shall be earned by and payable to Evolution per the following schedule:
> (i)  25% of the Commission shall be payable to Evolution within one (1) month of the commencement of the term of the purchase/sale agreement that [Roeslein] enters into with its counterparty . . .

(Id. ¶ 6(c).) Thus, whether and when the Commission payment is triggered depends on when the "commencement of the term of the purchase/sale agreement" between Roeslein and Duke occurred. This brings us to their agreement, which consists of a set of integrated agreements.

The Base Contract between Roeslein and Duke explicitly provides that the agreement between them "shall be the Contract as defined in Section 2.9." (Woodfork Decl. Ex. 23, Base Contract ¶ 1.1.) Section 2.9 defines Contact as follows:

> "Contract" shall mean the legally-binding relationship established by (i) the Base Contract, (ii) any and all binding Transaction Confirmations and (iii) where the parties have selected the Oral Transaction Procedure in Section 1.2 of the Base Contract, any and all transactions that the parties have entered into through an [electronic] transmission or by telephone, but that have not been confirmed in a binding Transaction Confirmation, <u>all of which shall form a single integrated agreement between the parties</u>.

(Id. ¶ 2.9.) Section 12 of the Base Contract provides that the Term of the Contract (that is, the Contract as defined in § 2.9) continues until one party gives 30 days written notice, or the expiration of the delivery period of any Transaction. (Id. ¶ 12.) Section 3.1, governing Performance Obligations, states:

> Seller agrees to sell and deliver, and Buyer agrees to receive and purchase, the Contract Quantity for a particular transaction in accordance with the terms of the Contract. Sales and purchases will be

4

> on a Firm or Interruptible basis, as agreed to by the parties in a transaction.

(Id. ¶ 3.1.) On the day the Base Contact was executed, Roeslein and Duke also executed document containing certain "Special Provisions to the [Base Contract]." (Woodford Decl. Ex 23, Special Provisions, ECF No. 146 (under seal).) As part of this, the following language was added to the parties' performance obligations in § 3.2:

> The parties agree that, because there are no minimum performance obligations and no minimum delivery quantities, there are no penalties for failure to deliver certain quantities . . .

(Id. § 3.) On March 16, 2015, Roeslein and Duke executed a Transaction Confirmation, providing for nine years of sales of natural gas at set prices, and for a quantity of "up to 675,000 MMBtu." (Woodfork Decl. Ex. 23, Transaction Confirmation.) It provides that "The terms of this Transaction Confirmation are binding pursuant to the terms set forth below." (Id.)

Section 2.1 of this Transaction Confirmation provides:

> During the Term, as defined herein, Seller agrees to deliver and sell to Buyer at the Delivery Point, and Buyer agrees to receive, take and purchase from Seller at the Delivery Point, all Biogas produced from the Facility up to the volumes set forth herein above and delivered at the Delivery Point . . . all at the Contract Price.

(Id. § 2.1.) This section therefore directs the reader to the definition of "Term," which in turn directs the reader to the definition of "Commencement Date." Section 1.6 defines Term as follows:

> "Term" commences on the Commencement Date and ends on the last

> Day of the [120th month] thereafter . . .

(Id. § 1.6.) The Commencement Date is defined in Section 1.1 as:

> . . . the date which is the *later* of (a) satisfaction of all of the conditions precedent set forth in Section 3.1 and (b) the date the biomethane purification and pipeline injection systems at Ruckman Farm have been completed.

(Id. § 1.1.)

## II. LEGAL PRINCIPLES

### A. Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party does not bear the ultimate burden on a particular claim or issue, it need only make a showing that the non-moving party lacks evidence from which a reasonable jury could find in the non-moving party's favor at trial. Id. at 322-23.

In making a determination on summary judgment, a court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010). Once the moving party has discharged its burden, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for

summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (internal citations and alterations omitted).

B. Breach of Contract

To succeed on a claim for breach of contract, a plaintiff must demonstrate "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y., 375 F.3d 168, 177 (2d Cir. 2004) (quoting Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996)). "Summary judgment is generally proper in a contract dispute only if the language of the contract is wholly unambiguous." Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc., 232 F.3d 153, 157 (2d Cir. 2000). "Ambiguity . . . is defined in terms of whether a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way." Topps Co. v. Cadbury Stani S.A.I.C., 526 F.3d 63, 68 (2d Cir. 2008).

Under New York law, "all writings which form part of a single transaction and are designed to effectuate the same purpose [must] be read together, even though they were executed on different dates and were not all between the same parties." This Is Me, Inc. v. Taylor, 157 F.3d 139, 143 (2d Cir. 1998); see also TVT Records v. Island Def Jam Music Grp., 412 F.3d 82, 89 (2d Cir. 2005). Whether multiple documents should be read as constituting a single agreement also depends

7

on the intent of the parties. TVT Records, 412 F.3d at 89; Commander Oil Corp. v. Advance Food Serv. Equip., 991 F.2d 49, 52-53 (2d Cir. 1993). The determination as to whether the parties intended the writings to constitute an integrated agreement is a question of fact appropriately decided by the court in a bench trial. See TVT Records, 412 F.3d at 89; Rudman v. Cowles Commc'ns., Inc., 280 N.E.2d 867, 873 (N.Y. 1972) ("Whether the parties intended to treat both agreements as mutually dependent contracts . . . is a question of fact . . . . [T]he primary standard is the intent manifested, viewed in the surrounding circumstances."); see also Arciniaga v. Gen. Motors Corp., 460 F.3d 231, 237 (2d Cir. 2006) (The circumstances surrounding the transaction are relevant to answering the question of whether multiple documents were meant to be read together.).

In TVT Records, the Second Circuit found that a "Heads of Agreement" ("HOA") and "side-letter agreement" were "one agreement." See 412 F.3d at 89. This determination was based, inter alia, on the fact that the documents were "intended to effectuate the same result." Id. The Court also found that the fact that the HOA and side-letter agreement had been negotiated and executed at different times and with different parties did not dictate a contrary result. Id. at 89-90. Similarly, in This Is Me, the Second Circuit found that separate agreements governing the video and live performances of a play should be read together because they were "components of a single project" as evidenced by the intent of the producers when they began the project. This Is Me, 157 F.3d at 145.

C. Breach of Fiduciary Duty

8

Under New York law, an actionable breach of fiduciary duty claim is comprised of "(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom." Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131, 138 (2d Cir. 2011) (internal citation omitted).  It is well established that "parties to a commercial contract do not ordinarily bear a fiduciary relationship to one another unless they specifically so agree." Calvin Klein Trademark Trust v. Wachner, 123 F. Supp. 2d 731, 733-34 (S.D.N.Y. 2000); see also Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 516 N.E.2d 190, 193 (N.Y. 1987) ("[A] simple breach of contract is not to be considered a tort unless a legal duty independent of the contract itself has been violated.").  And "where parties have entered into a contract, courts look to that agreement to discover the nexus of the parties' relationship . . . . If the parties do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them." Krys v. Butt, 486 Fed. App'x 153, 155 (2d Cir. 2012) (quoting EBC I, Inc. v. Goldman, Sachs & Co., 832 N.E.2d 26, 31 (N.Y. 2005)).

III. DISCUSSION

    A. Breach of Contract Claim

The core issue before this Court is whether the Roeslein and Duke transaction triggered the Commission payment set forth in Section 6 of the BSA.  A plain reading of the governing contractual agreements makes it clear that it was not.

First, the BSA provides that the Commission is "earned" within a month of

9

the "commencement of the term of the purchase/sale agreement." (Woodfork Decl. Ex 23, BSA ¶ 6(c).) According to plaintiff, this provision should be read as standing on its own, and should not be read with reference to the Base Contract or the Transaction Confirmation to which it is not a party. Plaintiff is incorrect. It is true that plaintiff Evolution could have made its Commission "earned" upon execution of the Bas Contract and the Transaction Agreement. But it did not. Instead, the BSA Evolution signed explicitly provides that the Commission is "earned" (a word itself suggesting that it is not immediately payable) on the "commencement" of the term of the "purchase/sale agreement." That is precisely what § 6(c) of the BSA provides. There is only one such purchase/sale arrangement – the integrated Base Contract and Transaction Confirmation – and the commencement of the term of that agreement is quite clear: It never began.

The "purchase/sale" agreement between Roeslein and Duke is – explicitly – an integrated agreement and includes both the Base Contract <u>as well as</u> the Transaction Confirmation. <u>See</u> <u>This is Me</u>, 157 F.3d at 143; <u>TVT Records</u>, 412 F.3d at 89. Indeed, the Base Contract states that "contract' means "the legally-binding relationship established by (i) the Base Contract, (ii) any and all binding Transaction Confirmations . . . all of which <u>shall form a single integrated agreement between the parties</u>." (Woodfork Decl. Ex. 23, Base Contract §§ 1.1, 2.9.) Thus, the BSA requires reference to the purchase/sale agreement, which points the reader to the Base Contract, which necessarily requires inclusion of the Transaction Confirmation.

10

The Transaction Confirmation is the sole document that sets forth the timing of when the term of the purchase and sale of the biomethane gas occurs. According to that document, the Term only commences once certain preconditions have been met. One of those preconditions includes "the date the biomethane purification and pipeline injection systems at Ruckman Farm have been completed." (Woodfork Decl. Ex. 23, Transaction Confirmation § 1.1.) It is undisputed that this precondition was never met. Plaintiff's argument that it would never have taken on the risk of this uncertain occurrence is contradicted by the agreement that it signed. It is also irrelevant that, as plaintiff argues, any preconditions must have been met because the Confirmation Fee was paid. The payment of that fee is not relevant to the Commission. In all events, the Confirmation Fee did not require the term of the purchase/sale agreement to have begun as the Commission explicitly does. (See Woodfork Decl. Ex. 2, BSA § 6(c) ("25% of the Commission shall be payable to Evolution within one (1) month of the commencement of the term of the purchase/sale agreement . . .").)

The above rationale makes it clear that both the breach of contract action and the account stated claim must be dismissed because no Commission was yet payable, and no invoice attached to an actual payment obligation.

  B. Fiduciary Duty Claim

Roeslein's counterclaim for breach of fiduciary duty also fails. Here, the BSA provides the parameters of the contractual relationship between the parties. See Krys, 486 Fed. App'x at 155. There is no special relationship between the parties in

11

any of the contractual agreements they signed that supports a claim of fiduciary duty.

Furthermore, according to Roeslein, the breach of a fiduciary obligation is based on a failure to obtain the highest price for the biomethane gas and to disclose its dual representation of Roeslein and Duke to either party. But this is all rather theoretical – as it is Roeslein who asserts that it was never in a position to have provided the biomethane gas. The facts of this action render the price of the deal and the representation issues irrelevant.

CONCLUSION

For the reasons set forth above, the Court GRANTS defendants' motion for summary judgment on plaintiff's contract claim, and also GRANTS plaintiff's motion for summary judgment as to defendants' counterclaim.

This action is therefore dismissed. The clerk of court is directed to terminate any open motions and to terminate this action.

SO ORDERED.

Dated: New York, New York
August 16, 2018

_____
KATHERINE B. FORREST
United States District Judge